**Lynell FRANKLIN et al., Plaintiffs,**

v.

**Pleasant C. SHIELDS et al.,
Defendants.**

**Civ. A. Nos. 74–C–214–R(C), 74–C–215–R
(C), 74–C–230–R(C) and
74–C–109–H(C).**

United States District Court,
W. D. Virginia.

Aug. 5, 1975.

Stephen Saltzburg, University of Virginia School of Law, Charlottesville, Va., for plaintiffs.

Linwood T. Wells, Jr., Asst. Atty. Gen., Richmond, Va., for defendants.

## MEMORANDUM OPINION and ORDER

TURK, Chief Judge.

In the consolidated cases of *Bradford v. Weinstein*,[1] and Jenkins v. Tyler, 519 F.2d 728 (1974) the Court of Appeals for the Fourth Circuit held that the due process clause of the Fourteenth Amendment applies to parole eligibility hearings and remanded the cases to the district courts for determination of "how much process is 'due.'" At the time of these decisions or shortly thereafter this court received *pro se* complaints from the four named plaintiffs herein, each of whom is a Virginia prisoner who was eligible for parole and had been denied parole at least once. Since each of the plaintiffs challenged the procedures by which they had been denied parole, the four cases were consolidated, counsel was appointed and leave to file an amended complaint was granted. By amended complaint plaintiffs sued the five current members of the Virginia Probation and Parole Board (hereinafter "the Board") in their individual and representative capacities seeking both monetary damages and injunctive relief.

With respect to their claim for injunctive relief plaintiffs have asked that the suit be treated as a class action

1. Certiorari granted, 421 U.S. 998, 95 S.Ct. 2394, 44 L.Ed.2d 664 (1975).

pursuant to Rule 23(a) and (b)(2) of the Federal Rules of Civil Procedure. They seek certification of a class consisting of all prisoners and potential prisoners in Virginia who are now, or who hereafter may become eligible for parole. The defendants have agreed that a class action is appropriate with respect to the claim for injunctive relief. Because this court finds that the requirements of Rule 23(a) and (b)(2) have been met with respect to the proposed class, certification of the class is accordingly granted.

Plaintiffs submit that as a matter of constitutionally required due process of law, prisoners are entitled to the following procedural protections with respect to parole determinations:

(1) written notice or access to written notice of the standards and criteria used by the Board in determining whether parole will be granted;

(2) a hearing and personal appearance before the Board regarding the parole decision in their cases;

(3) an opportunity to inspect their prison files which are utilized by the Board in determining whether parole will be granted;

(4) an opportunity at the parole hearing to call witnesses and present evidence in support of a favorable parole decision, and an opportunity to cross-examine persons who have provided information to the Board which adversely affects their chances for parole;

(5) appointed counsel or appropriate counsel substitutes at the hearing when specific facts are in dispute or when counsel is needed to assist them in communicating; and

(6) a statement of reasons for the denial of parole that are substantially related to the criteria used by the Board in making parole determinations and an indication of the changes in attitudes, habits, etc. which will be required before parole will be granted.

Trial of these consolidated cases was held in Charlottesville, Virginia on March 21 and 22, 1975, and on the basis of the evidence there presented and the earlier Stipulations agreed upon by the parties, the court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On January 6, 1975 the defendants formally adopted standards and criteria governing parole decisions. Prior to this time, no formal standards and criteria existed. Following the adoption of these standards, the Board requested that copies be posted at each penal institution and be given to incoming inmates. The plaintiffs agree that the standards and criteria adopted on January 6, 1975 are constitutionally adequate. Defendants, however, deny that any such standards are constitutionally required although they concede that they are useful and indicate that they have no intention of withdrawing those now in effect.[2]

Since January 1, 1975, as a matter of Board policy, all eligible inmates are personally interviewed by at least two members of the Board before a parole decision is made. These two members and at least one other member of the Board then make the parole decision.

---

2. Plaintiffs Franklin and Wilson were considered for and denied parole prior to the promulgation of standards by the Board and the defendants' action in promulgating the standards came after these suits were initiated. Although not raised by defendants, there is a question as to whether the issue of standards has been rendered moot by defendants' action. In view of the timing of the promulgation of the standards and the defendants' strong assertion that such standards are not constitutionally mandated the court is of the opinion that this issue is not moot. See United States v. W. T. Grant Co., 345 U.S. 629, 632, 73 S.Ct. 894, 97 L.Ed. 1303 (1953); United States v. Phosphate Export Ass'n, Inc., 393 U.S. 199, 89 S.Ct. 361, 21 L. Ed.2d 344 (1968); cf. Richardson v. Ramirez, 418 U.S. 24, 94 S.Ct. 2655, 41 L.Ed.2d 551 (1974). The court similarly is of the opinion that the issue of hearings for inmates is not moot even though the Board now grants hearings in all cases.

Prior to January 1, 1975, the Board on occasion would consider an inmate for parole without the benefit of a hearing. This was done when an inmate was not present at a particular institution on the day the Board held parole hearings at such institution. Three of the named plaintiffs were in the past considered for and denied parole without a hearing. Although as a matter of policy, the Board no longer denies inmates personal appearances, it challenges the plaintiffs' contention that such hearings are constitutionally required.

In the past and under present procedures inmates are not permitted access to their prison classification files which are used by the Board in making parole decisions. Two of the named plaintiffs —Vette and Wilson—sought and were denied access to their files in the past. It is generally understood by inmates that such files are not available to them. These files contain such things as presentence reports, psychiatric and medical reports, disciplinary reports, reports from inmate counselors and parole officers, letters from an inmate's relatives, former employers, law-enforcement officers, judges, etc., and letters from the inmate to the Board or prison officials. Most of the information in the files could be revealed to the inmates without the risk of adverse effects; however, inmate access to certain information in the files would present serious problems. For example, some information in the files has been supplied by persons with the understanding that such information would remain confidential, and if that confidence were breached a danger of reprisal would exist. Also, psychiatric and psychological information in the files could easily be misunderstood by an inmate and thereby hinder his readjustment.

With respect to the psychological information, the evidence indicated that inmate files routinely contain the results of intelligence tests and a summary of a clinical interview conducted by a psychologist employed by the state. Some files also contain the results of "projective tests" which attempt to measure personality traits. An inmate's intelligence quotient is expressed in his file in terms of a numerical figure together with a characterization, e.g., "superior", "bright normal", "borderline", "moderate retardation". Such characterizations and psychological evaluations, if not explained, could be misleading and detrimental to inmates. Although only one of the Board members has any formal psychological training, through experience the psychological information and intelligence characterizations and psychological evaluations can be fairly understood by them.

There exists at least two copies of an inmate's file. One is maintained by the Department of Corrections in Richmond and is used by the Board in making parole determinations. A second file follows the inmate from institution to institution. In addition, a medical file is maintained on each inmate. The named plaintiffs have demonstrated that some of the information in their files is factually erroneous and that the Board does not undertake to verify the information contained therein in the absence of obvious error. Although the Board will read and consider information offered by inmates on their own behalf, it does not as a matter of course file such information.

To comply with the plaintiffs' claim that inmates should have access to their files prior to a parole hearing, the state would have to insure that the information filed in the Division of Correction's file in Richmond would also be contained in the file which follows the inmate. Since both files now apparently contain much of the same information, a minimal burden would be imposed in this regard. The administrative burden imposed in removing confidential or detrimental information from such files would be more substantial due to the difficulty in determining exactly what information should be removed and how to present such information to an in-

mate in a manner which would not be harmful to him and would not breach confidential sources. Another burden would be imposed by having to release the files to inmates for a reasonable period of time prior to their hearing in order that they could be reviewed. This burden would appear to be minimal because inmates are familiar with most of the information in their files and could review them in a few hours. Furthermore, since duplicate files exist it is unlikely that destruction or alteration of documents is a realistic threat.

The primary advantage of allowing prisoners access to their files would be that errors in files could be corrected and adverse information explained with the result that the parole decision-making process would be improved. A second advantage would be that the inmates affected by adverse parole decisions would perhaps view the system as fairer and more accurate than at present, which in turn could aid in their adjustment.

In Virginia persons convicted of felonies are eligible for parole after serving one fourth of their sentence. Va.Code Ann. § 53–251 (1974 Repl.Vol.). The Board is required to "review the case of each prisoner as he becomes eligible for parole and at least annually thereafter until he is released on parole or otherwise." Va.Code Ann. § 53–252 (1974 Repl.Vol.). The Board in some cases holds hearings for inmates more frequently than the annual hearings called for by statute. Under the present system of parole determination in Virginia the Board conducts interviews with eligible inmates at 19 institutions across the state. In the fiscal year 1973–74 the Board considered 3,792 inmates for parole and granted parole in 1,542 cases. Hearings in most cases were conducted by two of the five Board members. As a matter of Board policy these hearings are informal. The Board does not permit inmates to present family members, witnesses, advisors or lawyers at such hearings. The Board does however allow persons interested in an inmate's parole to appear by appointment before them in Richmond. Such hearings by interested parties are not frequently undertaken and the Board does not perceive such hearings to be very useful.

The Board's reason for not allowing family, witnesses, advisors or lawyers to appear at an inmate's parole hearings is that such persons would substantially increase the time consumed at such hearings without adding materially to the decision-making process. A second reason, and one which applies primarily to the Board's policy of not permitting inmates to have lawyers, advisors or adverse witnesses present at the hearings, is that the presence of such persons would alter the present informal nature of the proceedings and make such hearings adversary in nature.

In the past and at present the Board supplies written reasons to inmates as to why parole has been denied. An inmate who is dissatisfied with the stated reasons can request a further explanation which the Board will endeavor to supply. Although the reasons given for the denial of parole are related to the criteria adopted by the Board, plaintiffs challenge them as being too *pro forma* and superficial. The reasons given to plaintiff Vette for his parole denial was that he had "been in trouble with the law since his 15th birthday" and his "release at this time would depreciate the seriousness of the offense committed and it is thus incompatible with the welfare of society." Plaintiff Wilson was denied parole because of his "long history of abuse of intoxicants" and he had "violated work release earlier this year." Plaintiff Franklin was denied parole because his "past record, which includes two felony sentences and a revocation of probation since 1968, is very much against favorable consideration for parole at this time" and his "need to show more consistency in [his] behavior adjustment." Plaintiff Jones was denied parole because he "[had] a criminal record dating back to 1964."

## CONCLUSIONS OF LAW

In *Bradford v. Weinstein* and *Jenkins v. Tyler, supra,* the Court of Appeals concluded that:

Since North Carolina and South Carolina have both adopted legislation affording even the prisoner serving the longest term upon conviction of even the most heinous crime the right to be considered eligible for release, usually upon one or more conditions, prior to service of the entire term imposed on him, we have no difficulty in concluding that the due process clause has *some* application to the proceedings in which it is determined whether the option shall be granted him. 519 F. 2d at 730–731. (emphasis in original).

Virginia has similarly extended an expectation of liberty in the form of parole eligibility to its prisoners,[3] and for this reason the Constitution requires that the procedures utilized by the state in determining whether such expectation will be realized must be fundamentally fair. The task before this court is that of striking a balance of minimal fundamental fairness in light of the interests of the plaintiffs in their statutorily-granted expectation of liberty and the interests of the state and society in the orderly administration of the parole system.

### A.

The court has no hesitation in concluding that published standards and criteria governing parole determinations are constitutionally required. The interests of the inmates in this regard are obvious and compelling. Without such notice of the standards against which they will be judged for parole, inmates cannot rationally attempt to meet the requirements for parole and may be denied parole simply because they are unaware of what is required of them. Inmates also have an interest in knowing that their conditional liberty was not arbitrarily denied, yet without published standards the potential for and appearance of arbitrariness is magnified.

The state's interest does not appear to be contrary to that of the inmates in this regard. The purpose of parole was aptly stated by the Supreme Court in *Morrissey v. Brewer,* 408 U.S. 471 at 477, 92 S.Ct. 2593 at 2598, 33 L.Ed.2d 484 (1972):

Rather than being an *ad hoc* exercise of clemency, parole is an established variation on imprisonment of convicted criminals. Its purpose is to help individuals reintegrate into society as constructive individuals as soon as they are able, without being confined for the full term imposed.

This rehabilitative purpose behind parole is decimated when the persons sought to be rehabilitated are not apprised of the standards they must meet, and the defendants conceded at trial that such standards were valuable. Finally, the burden imposed upon the Board in promulgating and distributing standards and criteria is *de minimus* as is evidenced by the fact that constitutionally adequate standards were adopted by the Board in January of this year and are now given to inmates entering the Virginia penal system as a matter of course.

In view of the above considerations, the court concludes that as a matter of constitutionally required due process of law written standards and criteria governing the granting of parole must be adopted and made readily available to inmates of the Virginia penal system. The court further concludes that the standards and criteria adopted by the Board on January 6, 1975 and thereafter distributed to inmates satisfied this requirement. Since the defendants have stated that they have no

---

3. Persons convicted of felonies in Virginia are eligible for parole after serving one fourth of their sentence or after serving twelve years of the sentence if one fourth of the sentence exceeds twelve years. Persons sentenced to life imprisonment are eligible for parole after serving fifteen years. Va. Code Ann. § 53–251 (1974 Repl. Vol.)

intention of rescinding these standards, injunctive relief is not necessary.

### B.

■ A personal hearing has come to be recognized in various contexts as a constitutional requisite of due process when an individual's interest in liberty or property is at stake. *See e. g., Goss v. Lopez,* 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (suspension of public school students); *Wolff v. McDonnel,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (prisoner disciplinary proceedings); *Morrissey v. Brewer,* 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (parole revocation proceedings); *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971) (suspension of driver's license). A personal confrontation protects an individual from suffering a "grievous loss" by minimizing the risk that public officials will reach a decision based upon unexplained or mistaken facts. In *Bradford v. Weinstein, supra* the Court of Appeals commented in this regard:

> We think it would be a grievous loss for a prisoner by reason of a completely ex parte proceeding, and the resulting increased opportunity for committing error, to be denied parole and required to serve more of his term because the attention of the parole board was not called to data tending to indicate that parole should be granted . . . . 519 F.2d at 732.

■ A personal hearing is also beneficial to the Board and society insofar as the reliability of parole decision-making is enhanced by such hearings. The Board itself apparently recognizes the value of such hearings since personal interviews have been a part of the Board's procedure for some time and as of January, 1975 the Board has deferred parole decisions in all cases until after an interview has been held. Although the burden in conducting such interviews is substantial, it is apparently manageable. Accordingly, the court concludes that as a matter of constitutional due process of law hearings are required. Since the present procedures for conducting parole hearings satisfy this requirement no prospective injunctive relief is necessary.[4]

### C.

As a matter of procedural due process of law, the court concludes that inmates should be afforded access to the information upon which the Board relies in reaching its decision whether to grant or deny parole. Since duplicate files which accompany the inmates are presently maintained, the administrative burden in requiring duplicate filings and affording inmates a reasonable period prior to their hearing in which to review their files is not great. Nor is the potential for alteration or destruction of the duplicate files a substantial danger. On the other hand, the burden on the prison system in establishing and maintaining a procedure for removing or altering confidential or potentially harmful information is substantial. Although most of the information in the files is harmless, certain information would have to be removed and possibly some reports would have to be rewritten so as to protect the author's identity.

Against this burden must be weighed the basic notion of fundamental fairness which would allow an individual an opportunity to attempt to refute or explain adverse or erroneous information which might result in parole denial. It is clear from the evidence presented in this case that erroneous and outdated information exists in inmate files and that without inmate access to the files it is unlikely

---

4. Although plaintiffs have not specifically requested declaratory relief, in addition to injunctive relief they have asked for "such other additional or alternative relief as appears to the court to be equitable and just under the circumstances." With respect to the issues of "standards and criteria" and "hearings," the court is of the opinion that in light of the present circumstances a declaratory judgment pursuant to 28 U.S.C. § 2201 is appropriate.

that the Board will be made aware of it. It is also obvious that in some instances adverse information can be explained away. By affording inmates an opportunity to do this, parole determinations would be fairer and more reliable in both appearance and substance.

Although the question of prisoner access to their files is not free from doubt, on balance the court is of the opinion that the interests of the individual inmates in seeing their files outweigh the burden on the state in affording such access and removing potentially dangerous information therefrom. *Accord, Cooley v. Sigler*, 381 F.Supp. 441 (D.Minn.1974); *Childs v. United States Board of Parole*, 371 F.Supp 1246 (D.D.C.1973), modified, 511 F.2d 1270 (D.C. Cir. 1974); *Contra, Wiley v. United States Board of Parole*, 380 F.Supp. 1194 (M.D.Pa.1974); *Barradale v. United States Board of Paroles and Pardons*, 362 F.Supp. 338 (M.D.Pa.1973). Accordingly, the court concludes that the Board must afford inmates access to the information in their files for a reasonable period prior to their parole hearings. Such access may of course be denied with respect to information which would threaten prison security or present a substantial likelihood of harm to the inmate or others.

### D.

The court is of the opinion that at their parole hearing inmates do not have a constitutional right to call witnesses in their own behalf or to call and cross-examine persons who have supplied adverse information to the Board. To permit inmates to call witnesses at their hearing, whether favorable or adverse, would add substantially to the time and expense of such hearings and possibly inhibit persons from contributing information because of the potential that they might later be called as witnesses. By virtue of the volume of hearings conducted and the limits of its resources, a great deal of discretion must be afforded to the Board in structuring hearings.

As noted above, the Board does permit witnesses to appear before it in Richmond by appointment and does accept documentary evidence offered by inmates.

The interests of the inmates in calling and confronting witnesses at their hearing does not, in the court's opinion, outweigh the Board's interest in conducting hearings in the present, informal and non-adversarial manner. A parole hearing differs significantly from the usual situation such as a parole revocation hearing in which the right to call and confront witnesses is guaranteed. See *Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In the first place the relationship between an inmate and the Board is such that the need for witnesses is diminished. This relationship was described in *Hyser v. Reed*, 115 U.S.App. D.C. 254, 318 F.2d 225 (1963), *cert. den. sub nom. Thompson v. United States Board of Parole*, 357 U.S. 957, 84 S.Ct. 446, 11 L.Ed.2d 315 (1963):

> The Bureau of Prisons and the Parole Board operate on the basic premise that prisoners placed in their custody are to be rehabilitated and returned to useful lives as soon as in the Board's judgment that transition can be safely made. . . . Thus there is a genuine identity of interest if not purpose in the prisoner's desire to be released and the Board's policy to grant release as soon as possible. Here there is not the adverse, conflicting objectives as between the parolee and the Board inherent between prosecution and defense in a criminal case. 318 F.2d at 237.

Secondly, the right to confront and call witnesses serves an obviously important function when historical facts are in dispute; however, a parole hearing is primarily concerned with predicting future behavior, as opposed to a retrospective determination of a past occurrence and for this reason the individual's needs in this regard are generally not as great. See *Wiley v. United States Board of Pa-*

*role,* 380 F.Supp. 1194, 1200 (M.D.Pa. 1974). Accordingly, in light of the nature of parole hearings and the institutional needs of the Board in conducting numerous hearings with its limited resources, the court concludes that the present policy of excluding witnesses from parole hearings is not inconsistent with procedural due process guarantees of the Constitution. *See Wolff v. McDonnell,* 418 U.S. 539, 566–567, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

### E.

■ Plaintiffs urge that the appointment of counsel should be required for inmates in the same circumstances as were specified in *Gagnon v. Scarpelli,* 411 U.S. 778 at 790, 93 S.Ct. 1756 at 1764, 36 L.Ed.2d 656 (1973) for probationers or parolees facing revocation of their status:

> [C]ounsel should be provided in cases where, after being informed of his right to request counsel, the probationer or parolee makes such a request, based on a timely or colorable claim (i) that he has not committed the alleged violation of the conditions of which he is at liberty; or (ii) that, even if the violation is a matter of public record or is uncontested, there are substantial reasons which justified or mitigated the violation or make revocation inappropriate, and that the reasons are complex or otherwise difficult to develop or present.

Such a rule would require a case by case determination and add to the administrative burden and expense of the Board. It would also alter the non-adversarial nature of parole hearings by engendering disputes between inmates and the Board over the need for counsel or counsel substitute. And it seems clear that if advocates were appointed, the present informal, predictive nature of parole proceedings would be altered.[5] What was said in *Wolff v. McDonnell,* 418 U.S. 539 at 570, 94 S.Ct. 2963 at 2981 (1974) with respect to prison disciplinary proceedings applies with even greater force to parole hearings:

> The insertion of counsel into the disciplinary process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals. There would also be delay and very practical problems in providing counsel in sufficient numbers at the time and place where hearings are to be held.

As noted, the interests of the Board and inmates regarding parole are not inherently adverse, and although in some cases the appointment of counsel could aid both the inmate and the Board, the court does not believe that as a matter of constitutional due process any such rule is required in this regard.

### F.

■ Finally, the court concludes that a statement of reasons for parole denial should be given to inmates. Such reasons should be as clear and precise as possible, however, as a constitutional proposition such reasons need only be substantially related to the criteria adopted by the Board which have been found to be constitutionally requisite. For the most part the reasons given to the named plaintiffs satisfy this re-

---

5. In *Wiley v. United States Board of Parole,* 380 F.Supp. 1194 at 1200 (M.D.Pa.1974) the court aptly contrasted parole hearings and parole revocation proceedings:

[T]he parole release decision, . . . is a prognostic determination with respect to one's suitability for parole and is based on a complex of tangible and intangible factors and involves the discretionary application of knowledge derived from such fields as psychology, criminology, sociology and penology.

While the parole revocation proceeding basically is concerned with making a factual determination with respect to parole violation, parole decision-making centers on making a diagnostic and predictive determination with respect to whether the rehabilitation of the prisoner and the welfare of society generally would be best served by granting the inmate's conditional freedom rather than by his physical confinement.

quirement. The Board requires a large degree of discretion in exercising its judgment, and the court does not believe that a detailed narrative justifying the denial of parole is constitutionally required. The present procedure of supplying general reasons which are substantially related to the parole decision criteria and providing further explanation on request is constitutionally sufficient.

Accordingly, with respect to the plaintiffs' claims for injunctive relief, it is Ordered that:

(1) Within a reasonable period following the issuance of this decision, the Parole Board establish procedures for affording inmates who are eligible for parole an opportunity prior to their parole hearing in which to review the information to be considered by the Board in reaching a parole decision. Such procedures may limit access by inmates to information which would reveal confidential sources or information which state officials reasonably consider as posing a danger to the eligible inmate or others.

(2) In other respects the court finds that the present procedures of the Parole Board are constitutionally adequate and therefore plaintiffs' other claims for injunctive relief are denied.

(3) Pursuant to 28 U.S.C. § 2201 and Fed.R.Civ.P. 57 it is the judgment of the court that the Fourteenth Amendment to the Constitution requires that standards and criteria governing the Board's parole decisions be maintained and made reasonably available to the members of the plaintiff class and that the individual members of the plaintiff class are entitled to a personal hearing before members of the Board prior to a parole determination in their individual cases.

(4) Within a reasonable period of time after receipt of this opinion, defendants grant to the four named plaintiffs a new parole hearing which is consistent with the conclusions expressed herein.

## DAMAGES

The court finds as a fact that in denying the named plaintiffs parole the Board acted in good faith in accordance with their usual practice and statutory authority. Defendants were therefore performing a quasi-judicial function and as a matter of law are immune from suits for damages under 42 U.S.C. § 1983. *Brown v. Boxley,* No. 75–1186 (4th Cir. April 2, 1975); *Christmas v. Boxley,* No. 74–2351 (4th Cir. July 7, 1975). Accordingly, plaintiffs' claims for damages are denied, and it is so ordered.