**Thomas J. SITES, Individually and on behalf of all others similarly situated, Plaintiff,**

**v.**

**Arthur L. McKENZIE, Individually and in his official capacity as Warden of the State Penitentiary for Men at Moundsville, West Virginia, et al.**

Civ. A. No. 76-24-W.

United States District Court,
N. D. West Virginia.

Nov. 12, 1976.

Daniel F. Hedges, Charleston, W.Va., for plaintiff.

Richard E. Hardison, Deputy Atty. Gen., Charleston, W.Va., for respondents.

## MEMORANDUM ORDER

HADEN, District Judge:

Plaintiff, Thomas J. Sites, has brought this action under 42 U.S.C. § 1983 on behalf of himself and all others who are similarly situated. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343. The plaintiff has moved for summary judgment seeking declaratory relief on five legal issues.

The facts are undisputed. The Plaintiff is a seventy-six year old man who has been incarcerated for forty-five years in either the West Virginia Penitentiary or Weston State Hospital, a mental institution. In 1931 Plaintiff was convicted of first degree murder and sentenced to life imprisonment. During the course of his incarceration the Plaintiff was summarily transferred between the prison and the mental hospital on four different occasions: in 1946 he was transferred to the mental hospital; in 1970 he was sent back to the prison; in 1975 he was again transferred to Weston; and then in 1976 he was returned to Moundsville. Although by statute (i. e. *W.Va.Code,* 1931, 62–12–13, as amended), Sites was eligible for parole consideration in 1941, he did not receive his first parole interview until after he had been transferred from Weston to Moundsville in 1970.

The five legal questions presented to this Court are:

(1) whether the transfer statute, *W.Va. Code,* 1931, 28–5–31, as amended, which provides for summary transfers from prisons to mental institutions, deprives prisoners of due process and equal protection of the laws in contravention of the Fourteenth Amendment;

(2) whether Eligibility Regulation D–1 of the West Virginia Board of Probation and Parole, which precludes from consideration for parole those prisoners confined in mental institutions, violates the Equal Protection Clause of the Fourteenth Amendment;

(3) whether due process extends to the Plaintiff's right to consideration for parole eligibility and, if so, to what degree;

(4) whether due process requires that criteria be established upon which the parole decision is to be based; and

(5) whether the denial of access to vocational rehabilitation programs in the prison, in view of the receipt of federal funds by the West Virginia Department of Corrections, constitutes a violation of 29 U.S.C. § 794, which prohibits any recipient of federal funds from discriminating against the mentally or physically handicapped.

## I. TRANSFER STATUTE

The United States Supreme Court has recognized that commitment to a state mental institution constitutes a serious deprivation of liberty and, therefore, that commitment proceedings must be compatible with the Due Process Clause of the Fourteenth Amendment. *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). See *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972) and *Specht v. Patterson,* 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967). The West Virginia Supreme Court has likewise recognized the necessity of due process standards in the commitment process. *State ex rel. Walker v. Jenkins,* 203 S.E.2d 353 (W.Va.1974); *State ex rel. Hawks v. Lazaro,* 202 S.E.2d 109 (W.Va.1974). More specifically, other courts have recognized that transfers from prisons to mental hospitals involve serious deprivations of liberty which must be procedurally safeguarded. *Matthews v. Hardy,* 137 U.S.App.D.C. 39, 420 F.2d 607 (1969); *cert. denied,* 397 U.S. 1010, 90 S.Ct. 1231, 25 L.Ed.2d 423 (1970); *United States ex rel. Schuster v. Herold,* 410 F.2d 1071 (2nd Cir. 1969).

Defendants cite two recent United States Supreme Court cases, *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976) and *Montayne v. Haymes,* 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976), for the proposition that transfers of prisoners do not require the application of minimum due process standards. Yet a transfer from a state prison to a state mental hospital is substantially different from a transfer from one state prison to another.

The grievous loss to a prisoner involved in a transfer to the mental hospital is not merely "*any* grievous loss," as the *Meachum* Court described deprivations involved in intrastate prison transfers. *Meachum v. Fano, supra,* 427 U.S. at 224, 96 S.Ct. 2532. Rather it is sufficiently onerous to require the imposition of procedural protections. As stated in *Schuster, supra*:

"[i]n considering the problem posed we are faced with the obvious but terrifying possibility that the transferred prisoner may not be mentally ill at all. Yet . . . he will be exposed to physical, emotional and general mental agony. Confined with those who are insane, told repeatedly that he too is insane and indeed treated as insane, it does not take much for a man to question his own sanity and in the end to succumb to some mental aberration." *Id.* at 1078.

*W.Va.Code,* 1931, 28–5–31, as amended, provides as follows:

"When any convict in any of the state's prisons becomes mentally ill before his or her term of sentence expires, it shall become the duty of the warden or superintendent of such prison to notify the director of mental health, who, in turn, shall cause such convict to be sent to such mental institution as the director may determine. It shall then be the duty of the examining board of the hospital in which such convict shall be confined to observe said convict for a period of thirty days. If it be determined that said convict is not mentally diseased, he or she shall forthwith be returned to prison. If it be determined that said convict is mentally diseased, then the examining board shall forthwith forward to the clerk of the county court of the county in which such person is a resident a detailed report of their examination, which report shall immediately be presented to the mental hygiene commission of said county. Such commission shall give full faith and credit to this report, and, if satisfied that such

person is mentally ill, shall issue an order legally committing the mentally ill person to the hospital making the report, as though the person had been brought before it. All expenses incurred in this proceeding, as well as the hospitalization of the mentally ill person, shall be borne by the county of which he is a resident.

When it is determined that such mentally diseased convict has recovered, he or she shall be returned forthwith to prison. Any time spent in such institution shall be computed as part of the term for which he or she was sentenced. If the sentence of such convict expires while said convict is at such institution then, upon his or her recovery, he or she shall be discharged from said hospital in accordance with section three, article six, and section one, article seven of chapter twenty-seven of the official Code."

The "safeguards" provided prisoners under this statute are procedurally and substantively deficient in comparison to the protections afforded those who are committed under the civil commitment statute, *W.Va. Code,* 1931, 27–5–1, *et seq.,* as amended, or under the commitment statute for the criminally charged or convicted, *W.Va.Code,* 1931, 27–6A–1, *et seq.,* as amended. These latter statutes [1] provide an individual a panoply of procedural rights which a prisoner subject to commitment does not have. These safeguards include the following:

(1) right to notice of a commitment hearing, including an explanation of the charges;

(2) right to a hearing and to be present;

(3) right to counsel at every stage;

(4) right to present and to cross-examine witnesses;

(5) right to be examined by and to call as a witness an expert of his choice;

(6) right to periodic examinations after commitment.

Furthermore, the statute under scrutiny, *Code,* 28–5–31, permits commitment when a prisoner is found by the mental hospital

---

1. Actually *W.Va.Code,* 1931, 27–6A–1, as amended, affords the criminally charged or convicted, who are not prisoners, a "hearing conducted pursuant to the procedures prescribed in subsection (c) . . . [27–5–4]."

examining board to be simply mentally ill. *Code*, 27–5–1 and 27–6A–1 require, on the other hand, that a person be found not only mentally diseased or retarded, but that "the individual is likely to cause serious harm to himself or others." Proof of mental illness and the likelihood of causing serious harm must be established by clear, cogent, and convincing evidence to the satisfaction of the state circuit court. A further deficiency in the statute in question is that a person transferred thereunder is not released at the expiration of his sentence but rather remains confined pending "his or her recovery."

The United States Supreme Court in *Baxstrom v. Herold*, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), found no rational basis for distinguishing between the "civilly" and "criminally" insane. As the Court stated:

"[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. . . . Classification of mentally ill persons as either insane or dangerously insane of course may be a reasonable distinction for purposes of determining the type of custodial or medical care to be given, but it has no relevance whatever in the context of the opportunity to show whether a person is mentally ill *at all*." *Id.* at 111, 86 S.Ct. at 763.

In *Cameron v. Mullen*, 128 U.S.App.D.C. 235, 387 F.2d 193, 201 (1967), the court analyzed this language and concluded that "*Baxstrom* thus might be said to require the conclusion that, while prior criminal conduct is relevant to the determination whether a person is mentally ill and dangerous, it cannot justify denial of procedural safeguards for that determination." The Second Circuit in *United States ex rel. Schuster v. Herold*, 410 F.2d 1071 (2nd Cir. 1969), was even more explicit when it stat-

ed that "we cannot tolerate two classes of insane persons—criminal and non-criminal—when we are asked to examine commitment procedures available to both." *Id.* at 1081. Following the reasoning in *Baxstrom*, *Schuster* and *Cameron*, this Court adopts the *Schuster* holding that "before a prisoner may be transferred to a state institution for insane criminals, he must be afforded substantially the same procedural safeguards as are provided in civil commitment proceedings." *Id.* at 1073.

Accordingly, *W.Va.Code*, 1931, 28–5–31, as amended, is hereby declared unconstitutional as violating the Due Process and Equal Protection Clauses of the Fourteenth Amendment.

## II. PAROLE ELIGIBILITY

Regulation D–1 of the West Virginia Board of Probation and Parole Regulation Handbook provides that:

"Prisoners confined in mental institutions for observation and psychiatric treatment will not be interviewed by the Parole Board until it has received a complete report from the institution showing that there has been a recovery from the mental illness or disturbance."

The effect of this regulation on prisoners in mental institutions who have not "recovered" from their illness is to presume irrebuttably that they are dangerous, or, at least in some way, unfit for society. Recovery from mental illness should not be the exclusive prerequisite for release from commitment. Justification for commitment ceases also when an individual is found to be no longer likely to cause serious harm to himself or others. *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975). As pointed out in *United States ex rel. Schuster v. Herold, supra*, at 1073, "those 'twice-cursed'—as criminals and as mentally ill—should not be 'punished' for the 'crime' of becoming mentally sick while serving a prison sentence." This is what Regulation D–1 implicitly does.[2] Accord-

---

**2.** Since it has been established in this case that due process extends to prisoners the right to be committed only upon a procedurally sufficient hearing and upon a finding of dangerousness to himself or to others, and has further provided

the right to periodic re-examination, a regulation similar to Regulation D–1 might in the future be able to withstand constitutional scrutiny.

ingly, to grant parole hearings to prisoners not confined in mental institutions and to deny parole consideration to the Plaintiff because he was in Weston State Hospital was unequal and unfair.

Thus, it is clear that this regulation is unconstitutional because it denies prisoners in mental institutions the equal protection of the law.

### III. DUE PROCESS—PAROLE HEARINGS

### IV. PAROLE BOARD CRITERIA

The Fourth Circuit has held that a prisoner's right to consideration for parole eligibility is "an aspect of liberty to which the protection of the due process clause extends." *Bradford v. Weinstein*, 519 F.2d 728, 731 (4th Cir. 1974).[3] Exactly what due process requires was left to the district courts to determine. *Id.* at 733. Such a determination was recently made in the case of *Franklin v. Shields*, 399 F.Supp. 309 (W.D.Va.1975).

■ In the instant case, as in *Franklin*, several procedures have been asserted by the Plaintiff as constitutional "musts." For reasons which shall be discussed below, this Court is of the opinion that due process requires the following: (1) timely notice of the hearing; (2) the right to appear in person at the parole hearing and to present supporting material in advance; (3) prior dissemination of the criteria upon which the Board will base its decision; and (4) if parole is denied, a written statement of the reason or reasons for the denial. This Court does not hold, however, that due process affords a prisoner the right to prior access to his Parole Board file or the right to have an attorney or other advocate make a presentation on his behalf at the parole hearing.

(1) The requirement of timely notice is basic to the concept of due process of law. *E. g. Goldberg v. Kelly*, 397 U.S. 254, 267–

68, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). A prisoner is entitled to receive personal notice of the date and time of his parole hearing far enough in advance of the hearing to allow him to prepare his case, collect needed evidence or other supporting material, and otherwise ready himself for the hearing.

■ (2) The right to be present at the parole hearing to rebut evidence, and to submit supporting material are necessary aspects of the procedural protections guaranteed to potential parolees. This Court believes that the submission of such materials in advance of the hearing would not create an undue administrative burden; in fact, it might facilitate the Parole Board's consideration of the case. This Court agrees with the *Franklin* court that a prisoner is not entitled to call witnesses or to cross-examine witnesses who have supplied adverse information to the Board. *Id.* at 317.

■ (3) The parole statute, *W.Va.Code*, 1931, 62–12–13, as amended, does not provide, and the Board has not prescribed, meaningful standards or criteria of parole release eligibility. The regulations which provide a long list of who is not eligible for a parole interview (e. g. persons under certain sentences, escapees, violators of prison rules) have their origins in the statute. *Code*, 62–12–13(1)–(3). Though it is clear who is ineligible for the interview, there are no meaningful affirmative standards to determine who is eligible for release. The West Virginia statute which governs release provides only that release be in the "best interests of the State and of the prisoner," and further that the prospective parolee "[s]hall have satisfied the board that, if released on parole, he will conduct himself in a lawful manner and that his release is not incompatible with the best interests and welfare of society generally." *Code*, 62–12–13(4). This is not a meaningful listing of criteria for eligibility for parole.

---

**3.** The Supreme Court has been reluctant to decide whether due process extends to parole release hearings. *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) was vacated as moot. See Justice Stevens'

dissenting opinion in *Scott v. Kentucky Parole Board*, —— U.S. ——, 97 S.Ct. 342, 50 L.Ed.2d 218 (1976), which was remanded for consideration of the question of mootness.

Published criteria not only satisfy the fairness mandate implicit in due process, but they further the rehabilitative goals of the state. As stated in *Franklin v. Shields, supra,* "[i]nmates . . . have an interest in knowing that their conditional liberty was not arbitrarily denied, yet without published standards the potential for and appearance of arbitrariness is magnified." 399 F.Supp. at 315.

The "best interest" parlance of the statute has little value and the vagueness of its standards certainly warrant legislative attention. However, the statute might survive a declaration of unconstitutionality by a formulation and dissemination by the Parole Board of meaningful criteria upon which the Board will base its decisions. Defendants' argument that such criteria are not capable of being set down in writing is not persuasive. Parole Board criteria are not so subjective as to defy standardization and expression. The Virginia Board of Parole has proved this by promulgating such criteria, which were subsequently approved in *Franklin, supra.* Due process requires that such criteria be established in West Virginia. Accordingly, the Parole Board shall submit proposed criteria to this Court for approval within sixty days of entry of this memorandum order.

■ (4) A written statement of reasons for the denial of parole is as necessary to rehabilitation as is the access to criteria. One reason is that it helps to assure that the Board's decision was not based on an erroneous assumption of fact. *Childs v. United States Board of Parole,* 371 F.Supp. 1246, 1248 (D.D.C.1973). Also prior access to criteria and subsequent reasons for denial of parole give specific guidance to the parole applicant in seeking a more favorable consideration, thereby enhancing the rehabilitative goal. To comply with minimum due process standards, the reasons may be rather broad, but they must be related to the criteria and sufficiently precise to inform the prisoner of the area or areas of concern that resulted in the denial. The historic reason that it is "not in the best interest of society" is not sufficient. It

is purely conclusory and has no rehabilitative effect since it gives no indication of the deficiencies in the prisoner's conduct. See *United States ex rel. Richerson v. Wolff,* 515 F.2d 797 (7th Cir. 1975). This Court agrees with Judge Turk in that:

"such reasons should be as clear and precise as possible, however, as a constitutional proposition such reasons need only be substantially related to the criteria adopted by the Board which have been found to be constitutionally requisite. . . . The Board requires a large degree of discretion in exercising its judgment, and the court does not believe that a detailed narrative justifying the denial of parole is constitutionally required." *Franklin v. Shields,* 399 F.Supp. 309, 318–19 (W.D.Va.1975).

As was stated above, this Court finds no constitutional mandate either for the presence of an advocate at the parole hearing or for prior access to the prisoner's Parole Board or prison file. The Parole Board does permit the presence of an attorney, relative, or perhaps friend at the hearing, but does not allow participation by such a person as a matter of right. Often, the Board will call upon such person to provide information as to some area of concern to the Board. The Board has a substantial interest in conducting hearings in the present informal manner. As was noted in *Franklin,* "the interests of the Board and inmates regarding parole are not inherently adverse," and, quoting *Wolff v. McDonnell,* 418 U.S. 539, 570, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), "[t]he insertion of counsel into the . . . process would inevitably give the proceedings a more adversary cast and tend to reduce their utility as a means to further correctional goals." *Id.* at 318.

■ This Court does not agree with *Franklin* in one respect: that is, with regard to prisoners' access to their files. The administrative burden would certainly be substantial, but this alone does not justify denial of such access. This Court fears that opening the files to prisoners would unnecessarily violate the confidentiality of sources important in the development of

background and history on the interviewees. It is not difficult to imagine how such information could have a non-rehabilitative effect. Taking into account the access to criteria and the requirement for reasons for denial of parole, this Court finds the possible interest in locating and correcting a factual error in the file to be outweighed by the need for confidentiality.

## V. 1973 REHABILITATION ACT

Plaintiff further asserts that the denial of vocational rehabilitation opportunities to allegedly mentally ill prisoners in the prison is a violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. This Act prohibits discrimination against any mentally or physically handicapped individual in any program or activity receiving federal financial assistance and provides a cause of action for any discrimination on the basis of such handicap. *Gurmankin v. Costanzo*, 411 F.Supp. 982 (E.D. Pa.1976); *Bartels v. Biernat*, 405 F.Supp. 1012 (E.D.Wis.1975). See also *Lau v. Nichols*, 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974).

The definition of "handicapped individual" for the purposes of the Act provides that:

". . . such term means any person who (A) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (B) has a record of such an impairment, or (C) is regarded as having such an impairment." 29 U.S.C. § 706(6).

Plaintiff has a record of mental impairment and certainly has been regarded as having such. Furthermore, it has been admitted that the West Virginia Department of Corrections is a recipient of federal financial assistance. Accordingly, any exclusion of Plaintiff from participation in a vocational rehabilitation program simply because of his handicap is forbidden by the Act.

For the reasons stated, and because there is no genuine issue as to any material fact, the Court hereby grants the Plaintiff's motion for partial summary judgment.

Plaintiff's motion for certification as a class action is denied at this time in view of the fact that the declaratory judgment will have general force and effect to all persons who find themselves in the same situation.

This Court retains jurisdiction of this case for determination of the other claims and for such further proceedings as may be necessary.